No. 21-1247, Lenovo Holding Company, Inc. v. DoDots Licensing Solutions LLC. Mr. Stockwell. May it please the Court. Good morning, Your Honors. Thank you, Your Honors. Claim construction is the dispositive issue in this case, and we think the Board... Please speak up a little so those things get in the way. We think the Board erred by importing a negative limitation into the term NIM template such that it has to exclude compiled code or executable code. That's the principal error on appeal. In doing that, the Board did not recite and did not discuss this Court's standard for importing negative limitations into claim terms, and that was error. Under this Court's standard, the first place to look to see whether or not a negative limitation can be imported into a claim term like NIM template is the claims themselves. And in this case, not only does the claim language not support a negative limitation, it actually counsels against it. And for that, Your Honor, I'd point you to the 083 patent. The claim 1 of the 083 patent expressly says that the NIM template that the Board construed must include, quote, instructions configured to cause, unquote, either creating the GUI or pulling up and requesting content for the GUI, the graphical user interface. That claim 1 also includes language that discusses processors that, quote, execute the first networked information monitor template, unquote. Well, it almost has to be execution. The use of the word execute doesn't suggest that it's relying on compiled code. I'm sorry, Your Honor. I can't quite hear you. The fact that they use the word execute doesn't mean very much because it doesn't necessarily mean that there's compiled code. Even if you're talking about just language here, it still has to be executed. The template instructions have to be executed one way or the other. Your Honor, if we look at the specification here, it seems to be almost definitional. If you look at 21.45 to 60, it says the NIM definition defines the structure and then it goes on to say, while advantageously avoiding the need to distribute and support a hard-coded compiled application. So if that language from the specification is definitional, you lose on the claim construction, right? I would agree with that, Your Honor. And I think the point that we made below and that we've made before this court is that's one embodiment and that it was certainly an embodiment that the board relied upon. But I would also direct Your Honor to- But it doesn't seem to be just an embodiment if you look at the language. It does refer to the XML embodiment, but then the rest of that paragraph goes on to, more generally, talk about NIM definition and what's required by the claims, by what constitutes the invention. So, Your Honor, I understand your question and the board certainly pointed to that XML embodiment in supporting its decision. It acknowledged it was only one embodiment and may I turn to the specification and point to the other just to be- Well, I don't think you're quite addressing my language because, contrary to the way you present this passage in your brief, this other language here doesn't, on its face, appear to be limited to a particular embodiment. It says the NIM definition defines the structure of the NIM and then it goes on and has the language that I read to you. Okay. I mean, I guess the question before us then becomes whether this is just talking about one embodiment or whether it's talking more generally. And that's precisely, I think, the point that we make, Your Honor, and if I could point to the other embodiments. Go ahead. I think that's helpful for the court to understand. And if you look at the board's decision at A50 and 51, one of the things they said was they said dots or application media packages are synonymous with the NIM template. Okay. And if we look at the 083 patent, column 45, lines 50 to 56 in the record at A10, it says, quote, the home dot application 200, that is a NIM template, itself may be packaged as a dot. It says it has special responsibilities and rights, but it is, quote, as much a dot as any other dot. This embodiment enables the application executable. That is, the home dot is an application executable. That's at column 45. At column nine, lines 17 through 19, the specification says there are control calls contained within an application media package with a dot or NIM template that are also parsed and executed. The 407 patent says at column 11, lines 2 through 6 at A259, it's talking about the home NIM. It says the home NIM, again, the NIM template is executed with the client parser application, and it says that. Everything has to be executed. The fact that it talks about it still has to be executed, right? But, your honor, that is the point. It's executable code. This is calling the NIM template an executable application, and the board is saying, well, the NIM template has to exclude an executable application, but the very thing the specification says that you're downloading, the dot or the application media package, is characterized as an executable application. And, moreover, your honor, if you look at... But, am I not correct that whether your view is right or the patentee's view is correct, there still has to be execution one way or the other? Well, your honor, I would dispute that in this sense. Executable has an ordinary meaning of requiring executable code, not simply usage, which was what... But, executing as a verb is required, whichever view you take of the scope of this patent, right? Well, I don't know. I think if you're saying is execution a synonym with use, I would say no, because execution means something to skilled artisans here, and this context of the specification suggests it's executable or compiled code. Don't you have to execute the NIM template regardless? Yes, and computers do that through instructions, your honor. That's what code is. So, how do you exclude from the definition of the NIM template the very mechanism the patent discloses as being a NIM template, which is a downloadable application that is executable? And I would also point out, not only does it talk about the application being... But the point is that you have to have execution whether there's downloadable code or not, right? I guess I don't agree with that, your honor, in the sense that execution refers, in this sense, to executable code. If you're saying we have to use what's downloaded, the data or the code that's being downloaded, I would agree with that. Okay, and if I could, remember, we're not talking about an affirmative construction here. We're talking about a negative limitation that excludes code or compiled code. And again, on the exclusion, I would point you to the 407 patent at column 11, lines 15 through 18 at A259, and this goes to your central question, your honor. Well, is this language the board relied on applicable to all embodiments or is it contradicted by other embodiments? And the board said they looked in the specification and they saw no other embodiments in which there was compiled code or executable applications. I've pointed to the executable application embodiment. Here's another one, quote, in some embodiments, the home NIM... What column and line are you on? I'm sorry, it's column 11, lines 15 through 18. In some embodiments, the home NIM is distinct from other NIMs in the sense that a large proportion of the home NIM in such embodiments is pre-compiled. The very thing that the board said was the NIM template, the specification says, has the compiled code and the executable code. There's no basis for the board to import a negative limitation into that claim term with this specification in hand. And your honor started by asking, well, what is the meaning of execute? And it's true that the board pointed to Dr. Sacerdoti's testimony that essentially said, well, execute really means just use. And they cited to paragraph 66 of that testimony. This is what Dr. Sacerdoti said. Where are you? What page? This is in the board decision. They were citing this around A53 to A55. They cited a paragraph 66 of Dr. Sacerdoti's. Yeah, but you're asking us to look at his testimony. Yes. Where is that? A2425. What volume? I believe that's the second volume, your honor. But I don't have my volume in front of me, so it may be the third. Okay. So, and I'm reading from my notes, and hopefully I noted this appropriately, but in paragraph 66, what the board relies on here. It's not paragraph 66. Okay. Yes. Dr. Sacerdoti says, he's talking about construing execute. And he says, because a template is a data structure, not an executable program. Then he goes on to talk about how execute could just mean, a skilled artisan would execute means use. But he's assumed the conclusion here. He's assumed, well, a template's just a data structure, not an executable program. Then he construes the language. This is not the kind of extrinsic evidence that is entitled to any TEVA deference whatsoever. And it contradicts the intrinsic evidence of the specification that I just went through. Did you put in expert testimony to contradict this? We did not, your honor, because we relied on the intrinsic evidence itself. I'm not aware of this court requiring parties arguing intrinsic evidence to require them to have expert testimony. Well, it's a question of whether the board's decision is supported by substantial evidence, right? I apologize, your honor. I did not hear you. I say it's a question of whether the board's decision is supported by substantial evidence when there's this expert declaration, which is uncontradicted. I think which, the way I would put it is, it's a question of whether this court reviews the construction de novo or gives some TEVA deference to the board's reliance on Dr. Sacerdoti's testimony. And we addressed this in our brief. And I would remind the court of what you did on remand in TEVA, where TEVA argued that simply because they had an expert testify about the factual issues, that was enough to obtain TEVA deference. And this court said, TEVA cannot transform legal analysis about the meaning or significance of the intrinsic evidence into a factual question simply by having an expert testify on it. Determining the significance of disclosures in the specification or prosecution history is also part of the legal analysis. And that's on remand 789 F3rd 1342. So in other words, just because Dr. Sacerdoti looks at the language of the claims and assumes the end result, that is it's a data structure, not an executable, and testifies about that is not entitled to deference. Anything else at the moment? Okay. I have a couple of questions. I see I'm in my rebuttal time, Your Honor. I have a couple of questions. Yes, I was going to ask you questions. Am I correct that the board made two independent findings? Your Honor, certainly. My friend on the other side argues that there is an independent finding that would be an alternative basis for justification. If we were to agree with that, that there is an independent finding or alternative findings, and we affirmed on one of them, then that disposes of the case, correct? I would agree with that if you accept their argument. We have set forth that, in fact, it's not an independent finding. It's under the whole NIM template analysis. That's actually the title of the section that the board is doing, and it follows after the board has announced that a NIM template cannot include code, and after it's found that the channel applications and Java applets we were pointing to had code. But the briefing seems to just limit the case to one issue, and that does not include whether the prior art contains both a NIM and a NIM template. That's correct, Your Honor, because the NIM template was found not to be present in the decision. That was the issue that the board found in that entire section of the opinion, and that was the only ground on which it rejected Lenovo's obviousness challenge. Anything else at the moment? No, thank you. All right, we'll stay at your rebuttal, Ted. Thank you, Your Honor. Okay, so will you enter, Mr. Goldberg? So far, I just see the seal of the court. He's going to be doing it by telephone, I think. It's being done by telephone. There we are. Can you hear us, Mr. Goldberg? You're still muted. I'm unmuted on my end. Yes, okay, we hear you. Can you hear us all right? I can hear you very well, thank you, Your Honor. Okay, we hear you, so I think we're okay. Okay. I'm just going to remove the barrier. Yeah, good idea. All right, I think we're ready. You may proceed when ready, Mr. Goldberg. Thank you. Good morning, Your Honors. Perry Goldberg from Progress LLP, and may it please the court. Your Honors, as Judge Reyna alluded to, there's a threshold question here of whether the board's decisions are based on two independent grounds, as we believe, or just one, as Lenovo contends. We believe that the board's decisions are crystal clear, that even if the board had agreed with Lenovo's claim construction, Lenovo still failed to meet its burden because Lenovo failed to identify— Can you hear me? Can you hear Judge Dyke? I can, yes. Does the fact that you're starting with this alternative argument suggest that you have doubts about the correctness of the board's decision itself on the executable construction? Not at all, Your Honor. I just believe that that is the simplest basis for affirmance, because if Your Honors agree there are two independent grounds and only one of them is affirmance would be appropriate, it's also the basis for our pending motion that this appeal be deemed frivolous, because under these circumstances there's precedent that an appeal such as this is frivolous. So we believe strongly in each of our arguments. This simply is the most expedient way to move forward and to simplify the issues. But what about in terms of the board's construction? They point to column 11, line 15, where it says in some embodiments the home NIM is distinct from other NIMs in the sense that a large proportion of the home NIM in such embodiments is pre-compiled. How am I to understand that? Yes, two points, Your Honor. The home NIM is different from the NIMs that are downloaded. So the home NIM is essentially the client parser application. So the whole framework here is that you have an application, the client parser application, that is already resident on the client's computing device. And then the NIMs that are defined by the NIM templates are the things, the NIM templates are what get downloaded from the server. And then the definitions are used by that client parser application to create the NIMs. So that's my first point is that the home NIM is a special thing. That's the client parser application. Secondly, we're hearing some arguments today that are very different from what Lenovo argued below and what they argued in their briefing. So quite a bit of it, frankly. But let's see. Here, we believe that the board was absolutely correct in the way that it defined the term NIM template, and we believe that that construction is entitled to deference. Indeed, two separate panels came to the same conclusion below, because there were two separate trials with two separate panels at the PTAP. But even if the negative limitation were removed from the construction, that still leaves the affirmative part. Can you hear Judge Dyke? I didn't hear. No, I didn't hear that last bit. We'll try again. Why is the construction entitled to deference? Oh, the construction is entitled to deference because it relies in part on factual findings, including a weighing of the evidence with respect to the expert testimony that was submitted. And so under those circumstances, under this course precedent, it is entitled to substantial, it's under the Substantial Evidence Standard. Yeah, and that's the Teva, for example, and Microsoft Corporation, and the organic case, any PTAP factual findings based on extrinsic evidence such as expert testimony and documents, not previously a record, are reviewed for support by substantial evidence in the record for the PTO. So that's our understanding, at least, Your Honor, but under any standard, we believe that the board had it right. But I think also another important point is Lenovo has the burden of showing not just that there was some error that was committed, but there is an error that would make a difference to the outcome. So they have not submitted any showing that even if the board were wrong to include a negative limitation, that would change the outcome. And that's because there's the affirmative part of the definition of the claim construction that is unchallenged. And the affirmative part requires that the template be a data structure, not just that you have some data, but that there is a data structure. And so they have not pointed to anything in the record that would suggest that the prior art utilizes data structures for the definitions. So, yeah, even if they could show that compiled code could somehow count, that compiled code would need to include a data structure, and they have just simply not shown any such data structure within their compiled code. Now, in addition to all of those different reasons why this court can affirm the decisions, there's also an affirmative ground of affirmance that we have urged. And that has to do with the, whether the prior art relied upon by Lenovo even qualifies as prior art. And . . . How are we supposed to decide that issue on appeal? I'm sorry, Judge Dike, it's difficult for me to hear you. How are we supposed to decide that issue on appeal about the contention that it's not prior art? Right. Okay. Well, so in terms of whether it's appropriate for appeal, it's an issue that was raised by us below. There are two different aspects to the issue. One pertains to the Berg reference in particular, which is a printed publication. And the other issue relates to whether, quote, unquote, secret prior art should qualify as prior art. And I'd like to address the second question first, which is, and that's a question that does not require any analysis of the facts of the case. And all the information that's needed to decide that is already of record. But just at a high level, the point is the patents that are relied upon by Lenovo, and this pertains to both of their combinations, all of the patents were not publicly accessible. None of them were publicly accessible. That's the touchstone when it comes to obviousness. And this goes back to the Hotchkiss case, the U.S. In enacting the Patent Act, it was expressly stated that Hotchkiss was essentially incorporated, that the case law under Hotchkiss was not meant to be superseded. And so the analysis, I'm sorry. Isn't the question just whether there are reference as to their filing date or as their issue date? Yeah, so that's a great, great question, Your Honor. So there's a difference between the filing date of the application, which is what Lenovo relied upon, and then the issue date. And of course, a lot can happen in the Patent Office between the filing of an application and the issuance of a patent. And it's very common for language to change, for things to change during prosecution. So the fact that there was an application filed prior to the priority date, the critical date here, doesn't mean that that application contained all of the identical language in the issued patent. So there's no showing that even the secret application contained the relevant information. But even if it did, our point is that the public didn't know about it. So when you look at Hotchkiss, which has a functional approach to considering obviousness and has to do with the background skill of the calling... We have... Wait. I'm sorry, Your Honor. Yes. We have always assumed that an application, secret or not, counts, right? Yes, Your Honor. That is the assumption. And there is a difference, of course, between a publication or, I'm sorry, an application that's been published versus an application that hasn't. But yes, Your Honor, this has not been something that, to my knowledge, that's been challenged. No, because it's in the statute. So you don't have to guess. Is it 102A established? Answer the question. Yes, Your Honor. So in terms of 102, you know, for anticipation, whether something meets that standard, the different circumstance than the obviousness analysis. So our point, and you know, it's not critical to the appeal, but we do think it's an interesting issue that hasn't been addressed, is that for obviousness, under Hotchkiss, we're supposed to be looking at what's the background skill of the calling. And when someone has a secret patent application, that's not the background skill of the calling. That's just information that one person happens to have. So we wanted to tee up that issue because we do believe that the obviousness analysis would benefit from some further guidance from the court about secret prior art, and particularly the burden in terms of showing at least that what was filed is equal to what eventually is issued, which has not been done here. They've just merely shown what was ultimately issued. That doesn't even mean that that was in the application. They haven't submitted the application as opposed to the final patent. Those are my points I wanted to make, Your Honors. If you have any questions, I'm happy to answer them. Otherwise, I'll yield my time. You seem to want to talk about everything except the board's claim construction. You know, Your Honor, we've addressed that in our brief. We think that the board's claim construction was absolutely correct. The terms NIM, like the NIM term, for example, that's not a term that has any ordinary, plain and ordinary meaning. That's not a term anyone has ever used to my knowledge outside of the patents. So when it comes to whether there's, you know, you should be looking to plain and ordinary meaning versus how these terms are defined in the patent, we think you should, you know, look to how they're defined in the patent. And all of the discussion of the NIM template demonstrates, it's very expressed, that you're talking about data structures and not compiled code. It even says that it's not compiled code. It has that phrase, quote, not compiled code. So we're not asking the court to do something in terms of a negative limitation that's not supported by the specification. But in any event, there's also expert testimony from our expert, Dr. Satridoti, that supports our view of how one of ordinary skill in the art would read these patents. And in rebuttal, the NOVO submitted no evidence, no expert testimony to rebut that. They have an expert that chose not to rebut Dr. Satridoti's testimony. They had every opportunity to do that, and they didn't, and that's very telling. So we believe the board's constructions were correct. The executable module that they're referring to is part of the client parser application that I referred to earlier. It's not an example of a template that gets downloaded from the server. It's not a NIM template. It's something different. It uses the definition that gets downloaded, but it isn't the definition itself. Okay, anything else for Mr. Goldberg? Any more questions for Mr. Goldberg? Okay. Thank you, Your Honors. And thank you. Sorry. You understand, we've removed these because otherwise the reflection for the camera, you just can't see us, whoever's speaking remotely. There's a lot more logistics nowadays. We're back to work. That's good. No. Okay, Mr. Stockwell. So I want to address two points, the separate independent ground point, which Your Honor raised and counsel addressed. And I think the best way to do that is if you just look at the board's decision, there was the structure of the decision. There was a claim construction, and then beginning on page 28, they analyzed the Rezavi and Banzai grounds, and they had the same structure earlier with respect to Hoff and Berg, beginning on page 19 when they analyzed that obviousness ground. At page 22, after they talk about that background, there's a section A, claim one, the NIM template limitation. And they set out the claim, and then they explain petitioner's contentions, and explain that we were asserting that the channel application contained, was the NIM, contained the NIM and the NIM template, and we acknowledge the channel application had executable code. And they recite how that is, but they say petitioner's arguments are not persuasive, because petitioner does not show persuasively that Hoff's and Berg's channel application containing the alleged NIM template comprises a data structure, which defines the characteristics of a NIM, and which excludes executable applications compiled code. And then they go through and explain how we admitted that the channel applications or the Java applets had compiled code. They contrast that to the claim NIM template that uses data structures rather than applets or applications. And then they say further, both parties agreed that the NIM and the NIM template were separate and distinct claim elements. The, that, and they go on to say, well, the channel application can't constitute the NIM template, because they've already found that the NIM template has to exclude code or compiled code, and we acknowledge the NIM template had it. So that is, that is the independent ground they point to is only the, under the structure of the board's decision is all about the NIM template. It's not about, you know, you did not show the NIM. It's, you didn't show the NIM template, because the thing you're pointing to, the channel application, has code in it. So we don't think that's an independent ground of, sufficient for rejection of Lenozo's obviousness case. And certainly the board didn't put it that way. And indeed, this court has recognized that, yeah, claim elements may be different. They may have different meanings, but you can find them in one structure. And that, the board didn't say, well, you can't find these two elements in one structure. So that's just not an independent ground. Your Honor, you asked about the home NIM to counsel. And I just, I want to point out that, again, the 083 patent at column 20 through 45, 20 line 45, says a home NIM is, quote, as much a dot as any other dot, unquote. And if you look at other parts of the specification, they give examples of like, suppose you never had your home NIM or home dot, and you're downloading a dot of interest for the first time. You click on it. That can automatically download the home dot with the dot of interest. The home dot is the executable. And the home dot includes other system dots. We're not saying there aren't some dots that are only data. But this specification clearly has dots or NIM templates that have both compiled code in them and are executable. And that's why the board's construction is wrong. Unless there's any questions. Thank you. Okay. Any more questions? Any questions? Okay. Thank you. Thanks to both counsel. The case is under submission.